543 A.2d 1143

**In re ESTATE OF Harry SIDLOW, Deceased.**

**Appeal of Hyman B. SIDLOW.**

Superior Court of Pennsylvania.

Argued Dec. 9, 1987.

Filed May 17, 1988.

Reargument Denied July 13, 1988.

Before WIEAND, KELLY and HESTER, JJ.

WIEAND, Judge:

Harry Sidlow died December 20, 1984, leaving a holographic will dated February 9, 1983. The will was admitted to probate in Delaware County, Pennsylvania, on December 27, 1984, and letters of administration c.t.a. were issued to the decedent's brother, Hyman Sidlow. On January 14, 1985, an earlier will, dated September 12, 1977, was filed in New Castle County, Delaware, and letters testamentary were there issued to Anita Cohen, a niece of the testator's deceased wife. Cohen then filed in the Orphans' Court of Delaware County, Pennsylvania, a petition to revoke the letters of administration c.t.a. which had been issued to Hyman Sidlow. The court, after full hearing, granted the requested revocation of letters on grounds that the testator had been domiciled in the State of Delaware at the time of his death. Hyman Sidlow appealed.

He argues (1) that Anita Cohen lacked standing to challenge the issuance of letters by the Register of Wills; (2) that the testator's domicile could not properly be challenged by a petition to revoke letters which had been issued pursuant to an unchallenged probate of a holographic will;

and (3) that the orphans' court erred in finding that the testator was domiciled in the State of Delaware. These issues assume their proper perspective when viewed against the different legal standards regarding the validity of holographic wills in the State of Delaware and the Commonwealth of Pennsylvania.[1]

Harry Sidlow and his wife, Nettie, lived for approximately twenty years in an upstairs, duplex apartment on Haverford Avenue in Overbrook Park, Delaware County, Pennsylvania. During these years Harry Sidlow conducted a check cashing business, known as "Harry's Check Cashing, Inc." at 503 Main Street, Darby, Delaware County, Pennsylvania. On or about April 15, 1976, Sidlow and his wife leased an apartment situated on the other side of the Pennsylvania line, but in close proximity thereto, at 3609 Society Drive, Claymont, Delaware. Although Harry continued to conduct his check cashing business in Pennsylvania, he and his wife lived in the Delaware apartment until Nettie died in 1982. Harry did not dispose of the Delaware apartment after his wife's death, but thereafter he spent most of his nights in the apartment which was located above his place of business in Darby, Pennsylvania.

On September 12, 1977, Harry had executed a will by the terms of which he left his entire estate to his wife, if she survived him; and if she failed to survive him, he bequeathed the sum of ten thousand ($10,000) dollars to Rosalyn Epstein and the remainder of his estate to Anita Cohen, his wife's niece. An undated codicil changed the specific bequest to five thousand ($5,000) dollars to Harry Daniel Elliott, but again left the remainder to Anita Cohen.

On February 9, 1983, Harry executed an unwitnessed, handwritten will by which he purported to leave his estate

1. The principal difference is that the law of Pennsylvania does not require subscribing witnesses to a will. See: 20 Pa.C.S. § 2502; *Keiper's Estate (No. 2)*, 20 Pa.D. & C. 2d 521 (Monroe 1960); 40 P.L.E. *Wills* § 137. Delaware law, however, does permit its courts to enforce wills which are valid in the place where the decedent had an abode at the time of his death. See: 59 Del. Laws, c. 384, § 1, 12 Del. C. § 1306.

to his sisters, Eva and Ethel, and to his brother, the appellant, "to be used as they see fit with the exception that they remember to help their cousins if they need [ — ] also to help my sister-in-law, Reba, the same as I have in the past." Three days later, he wrote on his copy of the earlier, 1977 will as follows: "This copy and original will now in Harry Baum's possession is null and void dated 2–12–1983 s/ Harry Sidlow."

When Harry Sidlow died almost two years later, he left a net estate of approximately $300,000. The vast majority of his estate was situated in Pennsylvania, including real estate situated at 503 Main Street, Darby and 891–893 Main Street, Darby.

 As a general rule, a party must have an interest in order to challenge the grant or denial of letters to administer a decedent's estate. See: *In re Obici's Estate*, 373 Pa. 567, 570, 97 A.2d 49, 50 (1953). See also: 20 Pa.C.S. §§ 907, 908 (referring to "any party in interest"); *Wilson's Estate*, 52 Berks 67 (1959); *Wertz's Estate (No. 1)*, 6 Pa.D. & C. 2d 429 (York 1955); 32 Std.Pa.Prac.2d § 153:102. A non-relative beneficiary under a will which has been expressly revoked lacks standing to challenge the administration of a later will. See: *McCarty's Estate*, 355 Pa. 103, 49 A.2d 386 (1946). However, a legatee under a prior will whose legacy is revoked only by implication upon the execution of a later will does have standing to challenge the validity of the later will because the contestant would be entitled to recover under the earlier will if the later will were declared invalid. See: *Ash's Estate*, 351 Pa. 317, 319, 41 A.2d 620, 621 (1945). This is consistent with the principle that, absent a specific revocation, the doctrine of relative revocation revives an earlier will which has been impliedly revoked by a subsequent will which is later declared invalid.

 Revocation may be effectuated by any later writing which evidences the decedent's intent to revoke, specifies what is to be revoked, and bears the decedent's signature at the end thereof, so long as it was executed with an intent to revoke. 40 P.L.E. *Wills* § 156. See: 20 Pa.C.S.A.

§ 2505. Words of revocation marked on a duplicate will may be sufficient to revoke an original which the testator is unable to obtain. See: *Taubel's Will*, 398 Pa. 19, 156 A.2d 858 (1959). No specific words of revocation are required, but phrases such as "null and void" have been held to be sufficient. See: *Kehr's Estate*, 373 Pa. 473, 95 A.2d 647 (1953). See also: *Holt's Estate*, 405 Pa. 244, 174 A.2d 874 (1961). However, in order for the revocation to be effective the signature of the testator must be proved by two competent witnesses, although they need not be subscribing witnesses. See: *Taubel's Will, supra.*

█ In the instant case, Anita Cohen was the residuary legatee under the testator's 1977 will. Although it appears that the testator attempted to make a specific revocation of that will, the validity of the revocation was not the subject of the hearing before the orphans' court. Consequently, the record fails to contain evidence establishing the genuineness of Harry Sidlow's signature as it appears on the words of revocation affixed to his copy of the 1977 will. The original of the 1977 will has been admitted to probate in the State of Delaware, and on the basis thereof letters testamentary were issued to Cohen.[2] Under these circumstances we conclude that Anita Cohen had sufficient standing to challenge the letters of administration c.t.a. which had been issued in Pennsylvania to administer the decedent's estate in Pennsylvania.

█ The provisions of 20 Pa.C.S. § 3181(a) permit the revocation of letters of administration "whenever it appears that the person to whom the letters were granted is not entitled thereto." In the past, the Supreme Court has permitted the matter of the decedent's place of residence to be litigated in proceedings to revoke the grant of letters of administration. See: *In re Obici's Estate, supra.* On the other hand, when there is a will, the provisions of 20 Pa.C.S. § 3181(b) permit the revocation of "letters testamentary or of administration ... [which are] not in conformity with the

---

2. The record reveals that the validity of the 1977 will is being actively challenged in the courts of Delaware.

provisions of a will admitted to probate." Where a will has been admitted to probate, the proper means for challenging the admission of the will to probate and the issuance of letters to administer the estate is by an appeal from probate. This was the procedure followed in *In re Estate of McKinley*, 461 Pa. 731, 337 A.2d 851 (1975).

■ Because of the relief requested by the petitioner in the instant case, the orphans' court revoked the letters of administration c.t.a. which had been issued to Hyman Sidlow. The result is an apparently valid will, duly admitted to probate in Pennsylvania, with no one to administer the testator's estate. The better procedure would have been for Cohen to raise the issue of the decedent's domicile by an appeal from the admission of his will to probate in Pennsylvania. Only if the testator had been a domiciliary of Delaware County, Pennsylvania, would his will properly have been admitted to probate and letters of administration c.t.a. issued by the Register of Wills of Delaware County.

In *Loudenslager's Estate*, 430 Pa. 33, 240 A.2d 477 (1968), the Supreme Court said:

The sole place of probate of a will of a Pennsylvania resident is mandated by statute to be the county wherein such person had "his last family or principal residence" ... at the time of his death. Under our case law, "residence", in the statutory sense, is synonymous with "domicile" (*Obici Estate*, 373 Pa. 567, 570, 571, 97 A.2d 49 (1953)). "The domicile of a person is the place where he has voluntarily fixed his habitation with a present intention to make it either his permanent home or his home for the indefinite future:": *Publicker Estate*, 385 Pa. 403, 405, 123 A.2d 655 (1956). See also: *Dorrance's Estate*, 309 Pa. 151, 172, 163 A. 303 (1932). We further said in *Publicker*, supra: "To effect a change of domicile there must be a concurrence of the following factors: (1) physical presence in the place where domicile is alleged to have been acquired, and (2) an intention to make it his home without any fixed or certain purpose to return to his

former place of abode: [citing an authority]." ([385 Pa.] pp. 405, 406, 123 A.2d p. 658).

In determining a person's domicile, the language of the United States Supreme Court, almost a century ago in *Mitchell v. United States*, 21 Wall. 350, 22 L.Ed. 584, is most appropriate: "A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation * * *. Mere absence from a fixed home, however long continued, cannot work the change [of domicile]. There must be the animus to change the prior domicile for another. Until the new one is acquired the old one remains. These principles are axiomatic in the law upon the subject." (21 Wall. p. 353). See also: *Price v. Price*, 156 Pa. 617, 625–627, 27 A. 291 (1893); *Dorrance's Estate*, supra; *Pusey's Estate*, 321 Pa. 248, 249, 265, 184 A. 844 (1936); *Obici Estate*, supra.

*Id.*, 430 Pa. at 37–38, 240 A.2d at 479. See also: *In re Estate of McKinley*, *supra; In re Obici's Estate, supra.* In the instant case, the decedent's domicile was initially in Pennsylvania. The requisite animus to change his domicile to Delaware had to be a present intention of permanent or indefinite residence in Delaware or, to phrase it differently, the absence of any intention not to reside there permanently or indefinitely. See: *Commonwealth v. Petrosky*, 168 Pa. Super. 232, 240, 77 A.2d 647, 652 (1951).

After having been domiciled in and maintaining a business in Pennsylvania for twenty years, the testator and his wife leased an apartment in Delaware in April, 1976. The apartment was located only a short distance from the Pennsylvania line, for the testator travelled daily to Darby, Pennsylvania, where he continued to attend to his business. The testimony showed that he had leased the apartment in Delaware at the request of his wife. She had received a threat in the old locale, according to testimony, and a situation had arisen in which "he wanted to stay in Pennsylvania, and she was bugging him to get near a relative, or

something like that, and she wanted to go down there. So, he said, just to satisfy her, he would get her a place."

After his wife died in 1982, the testator spent almost all of his time in Pennsylvania and at least three or four nights a week at the Darby apartment. The testator's newspapers and magazines were delivered to the Darby apartment; he frequently entertained there; and his soiled clothing and trash reflecting everyday living could be found there. One of his friends, a police officer who played cards with him at the Darby apartment, testified that he wasn't aware that the testator had another apartment. Another friend, who testified that the testator had slept at the Darby apartment most of the time, said that she had occasionally gone with him to the apartment in Delaware, where she had done his laundry. She said she had found canned goods in the Delaware apartment which were five or six years old. A sister testified that the testator had allowed her to reside in the Delaware apartment for several two week periods during which the testator was not present; and the testator's brother, Hyman, had used the apartment for six months after the breakup of his marriage. During that six month period, the testator had not occupied the apartment in Delaware.

During the years in which the testator had lived in Delaware with his wife, he filed Pennsylvania tax returns; he employed a Pennsylvania stockbroker, a Pennsylvania insurance agent, and Pennsylvania physicians. The testator's medicare coverage listed his Pennsylvania address; and six months before his death he told an insurance adjustor that he lived in Pennsylvania.

In an attempt to show that the testator's domicile had been changed to Delaware, evidence was offered that other tenants in the Delaware apartment building had sighted him in the area occasionally; that he frequently played cards on Monday evenings at a nearby club; that at the Pennsylvania hospital where he died, his address had been listed as the Delaware apartment; that prior to burial in a Pennsylvania cemetery, Shiva services had been held in the Dela-

ware apartment; and that following his death, notices were published in Delaware newspapers.[3]

Other evidence was equivocal. At the time of his death, the testator owned two Cadillacs, one registered in Pennsylvania and the other in Delaware. He held driver's licenses which had been issued by both states. He also had bank accounts in both states, although most of his money was held in Pennsylvania banks. In addition to a well furnished apartment in Delaware, the testator had a more modest apartment above the place of business which bore his name in Darby. He had made arrangements for the cleaning of both apartments.

■ As a general rule, the burden of proof lies with the party who alleges a change of domicile. See: *Loudenslager's Estate, supra; In re Obici's Estate, supra.* In the instant case, there can be no dispute—in fact, there was none—that the testator had been domiciled in Pennsylvania before he leased the Delaware apartment in April, 1976. The burden, therefore, was on Anita Cohen to show that the testator's domicile had been changed to Delaware. This burden of proof was not met. Although the testator leased the Delaware apartment and physically moved into it with his wife, the evidence does not establish that he intended to make it his permanent home, without intent to return to Pennsylvania. At no time did the testator sever his ties with Pennsylvania. It was in Pennsylvania that he maintained his business and to which he journeyed daily. It was there, in Pennsylvania, that he maintained an apartment, where he continued to maintain most of his assets, including bank accounts, real estate, and an automobile, and where he arranged to cover his assets with insurance. It was in Pennsylvania that he considered his home to be, and it was there that he obtained medical care when it was needed.

3. It was suggested that a Delaware domicile could also be inferred from the fact that the testator wrote his holographic will on the back of a sheet of checks which had been embossed with the address of his Delaware apartment. The legitimacy of such an inference is questionable. It may as well have meant that he was no longer doing regular banking at the Delaware institution.

He evidenced the truism that "where [a man's] treasure is, there will [his] heart be also." Matthew 6:21. In this case, the testator's treasure and also his heart were in Pennsylvania.

It was not surprising, therefore, that the testator returned physically and lived in Pennsylvania after the death of his wife. Thereafter, the testator's physical presence, his business, his assets, his health care, and most of his recreational activities were located in Pennsylvania. Remaining in Delaware were a largely unused apartment, an automobile, a certificate of deposit, and little else. He truly was a Pennsylvania domiciliary.

We hold, therefore, that the evidence was insufficient to show that the testator ever intended to change his domicile from Pennsylvania to Delaware. When the orphans' court determined that his domicile was in Delaware, it fell into error.

The order revoking the issuance of letters of administration c.t.a. in Pennsylvania is reversed.

KELLY, J., concurs in the result.